UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EDWARD ROOD,

     Plaintiff,

v.                        Case No.:  2:20-cv-981-SPC-KCD

TOWN OF FT. MYERS BEACH,
FLORIDA,

     Defendant.

_____/

## OPINION AND ORDER[1]

Before the Court is Defendant Town of Fort Myers Beach's Motion for Summary Judgment (Doc. 53).  Plaintiff Edward Rood responded in opposition (Doc. 60), to which the Town replied (Doc. 63).  The Court grants the Motion.

## BACKGROUND

This is an unusual Americans with Disabilities Act ("ADA") case.  It is odd because despite a long, complicated history between the parties on these facts, it had nothing to do with Title II of the ADA.  That is until Rood lost at a zoning hearing.

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees.  By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them.  The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

Fort Myers Beach is a moving island.  Bit by bit, reliable tides and relentless waves are shaping and reshaping the beach.  Over time, accretion deposited more sand on the island—cutting off some tidal waters from the Gulf and creating small coastal lagoons.  These lagoons are within an environmentally critical ("EC") zone.

For Rood, this created a problem.  There are two lagoons behind his house ("Property") separated by a vegetation-covered sand dune.  And the lagoons block his access to the beach.  But Rood had a solution.  He wanted to build a walkway from the Property—over the lagoons—to the dunes ("Dune Walkover").  Here is an approximate map of the project:



(Doc. 65 at 2).[2]

This wasn't a half-baked idea.  Rood seemingly jumped through every conceivable hoop: designing the Dune Walkover with Florida Department of Environmental Protection ("DEP") input, obtaining state and federal permits, getting DEP final approval through complicated, years-long administrative proceedings ("Order"), and securing a recommendation from the Town's land planning board.  Still, since the project was in an EC zone, Rood needed a special exemption from the Town council.  So he applied for one ("Exemption").

The Town held a hearing and denied the Exemption.  After, Rood applied for rehearing, which the Town denied following another hearing.  Having lost the zoning issue, Rood turned his focus to the ADA.  He never used a wheelchair.  But Rood has trouble walking from various health issues.  So he sued for failure to accommodate.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

---

[2] The Court judicially noticed this map and offered an opportunity to object.  (Doc. 65); Fed. R. Evid. 201; *United States v. Proch*, 637 F.3d 1262, 1266 n.1 (11th Cir. 2011).  No party objected.  (Doc. 67).  This map is not intended to be an exact representation of the Property or Dune Walkover.  Rather, it merely serves as a reference for the general gist of the project.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to show the lack of genuinely disputed material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If carried, the burden shifts onto the nonmoving party to point out a genuine dispute. *Beard v. Banks*, 548 U.S. 521, 529 (2006). At this stage, courts view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

## DISCUSSION

In general, disability discrimination claims take three forms: "(1) disparate treatment, (2) disparate impact, and (3) failure to accommodate." *Root v. Salazar*, 406 F. Supp. 3d 1322, 1325 (M.D. Fla. 2019); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) ("Both disparate-treatment and disparate-impact claims are cognizable under the ADA."). Disabled people may challenge municipal zoning decisions on one of these theories. *Palm Partners, LLC v. City of Oakland Park*, 102 F. Supp. 3d 1334, 1342 (S.D. Fla. 2015); *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999). Only failure to accommodate is at issue.

The parties rely on the wrong standards, which generally apply to ADA claims for employment discrimination or exclusion from public services. *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010); *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). This case differs because it relates to an adverse zoning decision. For instance, it makes little sense to wrangle over whether Rood is a "qualified individual" as that element mismatches his theory. *See* 42 U.S.C. § 12111(8) (defining as person who "can perform the essential functions of the employment"), *id.* § 12131(2) (defining as person who "meets the essential eligibility requirements for the receipt of services"). So many courts tweak the failure-to-accommodate test for residential zoning cases. *E.g.*, *Tracy P. v. Sarasota Cnty.*, No. 8:05-CV-927-T-27EAJ, 2007 WL 9723801, at *4-5, 8 (M.D. Fla. Sept. 5, 2007); *see also Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 479 F. Supp. 3d 1298, 1321 (S.D. Fla. 2020).[3]

To win on his failure-to-accommodate claim, Rood must show:

> (1) that he is disabled, (2) that he requested a reasonable accommodation, (3) that the requested accommodation was necessary to afford him an equal opportunity to use and enjoy a dwelling, and (4) that the defendant refused to make the requested accommodation.

---

[3] *See also Summers v. City of Fitchburg*, 940 F.3d 133, 139 (1st Cir. 2019); *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 967-68 (7th Cir. 2018); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 53 (2d Cir. 2002); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003); *Swanston v. City of Plano, Tex.*, 557 F. Supp. 3d 781, 797 (E.D. Tex. 2021).

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1264 (11th Cir. 2019) (cleaned up); *see also id.* at 1265 n.2 (explaining ADA principles apply equally to claim under Fair Housing Amendments Act ("FHAA")); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008) (same); *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 767 & n.4 (11th Cir. 2020) (same). That is a test under the FHAA, which the Complaint doesn't raise. To be sure, there are notable differences between the ADA and FHAA. *Schwarz*, 544 F.3d at 1212 n.6; *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1192-94 (9th Cir. 2021). Still, ADA and FHAA claims are usually analyzed together in zoning disability cases, so the general standards must be the same. *See, e.g.*, *Schaw*, 938 F.3d at 1264; *Summers*, 940 F.3d at 139 ("For present purposes, the elements of reasonable accommodation claims under the FHAA and the ADA do not differ in any meaningful respect."); *Good Shepherd*, 323 F.3d at 561 ("As a preliminary matter the requirements for showing failure to reasonably accommodate are the same under the ADA and the FHAA so we can treat these issues as one."). Because that is the most appropriate standard for Rood's claim, it applies.

The parties dispute four areas. While the Court considers them in a different order, it takes the issues in three broad parts.

## A.  Ripeness and Disability

To start, the Court addresses the Town's nonstarter arguments—(1) the case is unripe and (2) Rood isn't disabled.

First, this case is ripe.  Because ripeness is jurisdictional, the Court tackles it before anything else.  *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010).  This doctrine cautions courts against "rendering impermissible advisory opinions and wasting their resources through review of potential or abstract disputes."  *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1379-80 (11th Cir. 2019) (citation omitted).

According to the Town, Rood's claim is unripe because he neither used a wheelchair nor requested a needed accommodation.  As the argument goes, the case is premature since Rood's injury has not progressed far enough.  Not so. Rood contends he is disabled now regardless of his wheelchair use (or lack thereof) and demanded an accommodation.  What's more, the injury he seeks to remedy happened: the Town denied the Exemption.  *Cf. Karantsalis v. City of Miami Springs Fla.*, 17 F.4th 1316, 1323-24 (11th Cir. 2021) ("Under the ADA, [plaintiff] was not injured (and therefore did not have standing) until *after* he was denied the benefits of [defendant's] public services.").  Nor is this not an instance in which Rood sued before the Town finished reviewing his accommodation request.  *See Caron Found. of Fla., Inc. v. City of Delray Beach,*

879 F. Supp. 2d 1353, 1364-66 (S.D. Fla. 2012). Rather, if Rood requested an accommodation—which is a merits question—the Town denied it.

This case is "fit for judicial decision" (i.e., ripe) because there is no need for "further factual development" and all interests favor review. *Club Madonna*, 924 F.3d at 1380.

Second, the Court assumes (without deciding) Rood is disabled. Disability is an element of the claim. *Schaw*, 938 F.3d at 1264. According to the Town, Rood is not disabled because he does not use a wheelchair. Yet as Rood counters, he can be disabled without needing that device. *See* 29 C.F.R. § 1630.2(g)-(j). So wheelchairs aren't a *sine qua non* of ADA disability, like the Town implies. *E.g.*, *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343-44 (11th Cir. 2016) (holding plaintiff disabled because she used a cane for pain and balance related to gait dysfunction and spinal stenosis). Rood testified in support of his disability. That evidence is unrebutted. And there is no need to parse the disability question since the claim fails on much clearer grounds. *See Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1267-70 (11th Cir. 2014) (noting expanded ADA disability definition and advising against "extensive analysis" of it (citation omitted)).

The Town's remaining arguments in these sections (i.e., the need for the accommodation, failure to request it, and the Town's knowledge of Rood's disability) go to the other merits issues detailed below. So the Court addresses

them where appropriate and assumes Rood is disabled.  With that decided, the Court moves to the next prong.

## B.  Request

The parties disagree whether Rood requested an accommodation. Because he did not, the claim fails.

Plaintiff must have "requested a reasonable accommodation."  *Schaw*, 938 F.3d at 1264.  In fact, the duty to accommodate "is not triggered unless a specific demand for an accommodation has been made."  *Gatson v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).[4]  Generally, "it is the responsibility of the individual with a disability to inform [defendant] that an accommodation is needed."  *Id.* at 1364 (citation omitted).  So Rood bears the initial burden to show he made a request.  *Gee*, 818 F.3d at 1255-56.

There isn't a precise "form the request for a reasonable accommodation must take."  *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (cleaned up).  So neither "formalisms" nor "magic words" are dispositive.  *Id.* (citations omitted).  But plaintiff must make a request (in one form or another) that gives defendant "enough information to know of both the disability and desire for an accommodation."  *Id.*  Put another way, the "circumstances must

---

[4] *See also D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020); *Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016); *Schwarz*, 544 F.3d at 1219; *Charles v. Johnson*, 18 F.4th 686, 703 (11th Cir. 2021); *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285-86 (11th Cir. 2014).

at least be sufficient to cause a reasonable [defendant] to make appropriate inquiries about the possible need for an accommodation." *Id.*

The ADA does not expect telepathy though. So defendant "cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." *Schwarz,* 544 F.3d at 1219 (citation omitted) ("Simply put, a plaintiff must actually request an accommodation."). That said, willful ignorance is no defense. If defendant "is skeptical about an alleged disability or its ability to provide an accommodation," it must "'request documentation or open a dialogue' in what is known in the ADA-context as the 'interactive process.'" *Bone v. Vill. Club, Inc.,* 223 F. Supp. 3d 1203, 1213 (M.D. Fla. 2016) (quoting *United States v. Hialeah Hous. Auth.,* 418 F. App'x 872, 877 (11th Cir. 2011)).[5]

Despite having innumerable opportunities over several years, Rood did not request an ADA accommodation. It is undisputed he never demanded an accommodation in a direct, formal way. This is not fatal though because there is no required form for a request. *Hunt,* 814 F.3d at 1226. Instead, Rood must have offered enough information to put the Town on notice of the disability and

---

[5] *See also Bhogaita,* 765 F.3d at 1285-86; *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.,* 974 F.3d 652, 669 (6th Cir. 2020) (applying to ADA despite lack of statutory language); *McElwee v. Cnty. of Orange,* 700 F.3d 635, 642 (2d Cir. 2012) (ADA Title II).

desired accommodation.  *Id.*   For this, he plucks some statements out of context.  None carry the day.

First, the Exemption application referenced a wheelchair.  Attached were excerpts from the Order.  One page read, in part,

> [The Dune Walkover's] original six-foot width was reduced to five feet, which remains adequate to accommodate the anticipated need for the use of a wheelchair or mobility device by one of the Applicants. The steps at the waterward end of the [Dune Walkover] were replaced with ramps, also for use by a wheelchair or similar device.

(Doc. 53-6 at 38).  Twenty-two pages later, the Order continued,

> The Project, by virtue of steps taken to minimize its footprint to the minimum necessary to allow access by wheelchair or mobility device, to remove handrails, and by construction methods, including construction from the decking, has been designed to minimize destruction of wetland vegetation on sovereignty lands.

(Doc. 53-6 at 42).  While these statements appear to support Rood, the context tells otherwise.

The Order was comprehensive.  In all, it was seventy pages.[6]  That Order responded to an ALJ's recommendation.  While the two were similar, the ALJ's order was one hundred pages.  Aside from the length, the Order concerned

---

[6] The parties mistakenly believe the Order was only forty pages based on the excerpt in the Exemption application.  As the record says (Doc. 53-6 at 36), the full Order is available online: https://www.doah.state.fl.us/FLAID/DEP/2019/DEP_16-1343_06262019_013237.pdf.

environmental issues.  DEP issued it, and Rood only needed review because the Dune Walkover would cross EC land.  So the Order and Exemption application almost exclusively addressed environmental zoning issues.  And the application included Order excerpts to support the project narrative as it related to those matters.  In other words, the proceedings seemed to have nothing to do with the ADA or Rood's disability.  Even if Rood meant the excerpts to be a request (an explanation he only offers all these years later), they were not sufficient to put the Town on notice.

What's more, neither excerpt clarified whether anyone was disabled now or, if so, who they might be.  The unelaborated wheelchair use was just "anticipated." (Doc. 53-6 at 38).  Where the Order described Rood, it offered no hint at any disability: "Rood uses the [Property] four to five times per year.  He enjoys visiting the Gulf of Mexico and the adjacent beach area behind his" Property.  Order at 7-8.  Notably absent was any notion Rood struggled to get to the beach.  To compound the uncertainty, Rood was not the only person applying for the Exemption.  In fact, he wasn't an "Applicant" at all. (Doc. 53-6 at 1).  Rood's company owned the Property, so it was the Applicant.  Likewise, the co-Applicant was a company that owned the house next door.  Rood and his wife owned the first company; the neighbor, his wife, and three other people owned the second company. (Doc. 53-6 at 5).  So there were at least seven people to which these statements could have referred.

At most, these wheelchair references were stray remarks—buried in a thick record—with little, uncertain relevance to the issue at hand.

Second, at the Town's hearing on the Exemption, Rood's lawyer mentioned a wheelchair:

> And the Applicants agreed to five as the minimum amount to facilitate wheelchair access, which is gonna be needed by one of the homeowners eventually.

Hearing Video at 3:41:34.[7]  A corresponding PowerPoint slide said this: "5 feet is requested in order to facilitate wheelchair access, which will be needed by one of the homeowners."  Hearing Video at 3:41:42.  And lawyer argued the Dune Walkover's width was proper so neighbors could use it alongside "someone in a wheelchair."  Hearing Video at 3:42:53.

The Exemption hearing was almost three-and-a-half hours (including all presentations, public comment, votes, and recesses).  Rood's lawyer spoke for about an hour and fifteen minutes of that time.  For around three minutes, lawyer addressed whether the Town code allowed a Dune Walkover width greater than four feet.  During that portion, she made the comments above.

Lawyer's presentation did not seek accommodations for disabled people. Rather, she argued the Dune Walkover could be five feet wide because it would serve the entire neighborhood, not just the Property.  Since the Dune Walkover

---

[7] *Available at*, https://www.youtube.com/watch?v=4AWnnzeegKQ (last visited Aug. 17, 2022).

did not service a single family, lawyer contended no zoning code variance was needed. The five-foot width, she said, would simply make a sharing agreement (allowing neighbors to use the Dune Walkover) "more meaningful." Hearing Video at 3:43:03. Lawyer reasoned that accessibility codes require four-foot clearance for wheelchairs. Assuming a five-foot width, others could pass by a wheelchair user on the Dune Walkover, making that size more useful to the neighborhood as a whole.

This context is important because it clarifies the comments did not request an accommodation. Instead, lawyer argued why the Dune Walkover should be five feet wide, not four. In other words, the mention of a wheelchair was not directed towards needing the Dune Walkover for a disability accommodation. It was about justifying a wider walkway than opponents thought necessary and addressing public access.

Apart from that, lawyer's statements (as above) were unclear on whether someone had a disability at that time. She merely said an unidentified "homeowner" would need a wheelchair "eventually." Hearing Video at 3:41:34. This was vaguer than the Exemption application because it occurred while discussing shared use. So lawyer could have been referring to any homeowner in the entire neighborhood that might someday need a wheelchair.

In response here, Rood contends there was no place in the Exemption application to identify a disability because the form did not address it. He is

14

mistaken.  The application had sections to explain the request and reasons for it.  While Rood could have asked for an accommodation, he didn't.  Rather, Rood offered a six-page narrative about the project.  (Doc. 53-6 at 30-35).  The narrative made thoughtful (and convincing) argument on granting the Exemption.  Nowhere in that document was any suggestion the Dune Walkover bore any relation to a disability.  If the Town misunderstood his position, Rood could seek rehearing.  He did so—providing another detailed, six-page explanation of why the Town's decision was wrong on the merits.  This preceded an almost three-hour rehearing proceeding.  Yet there was still no inkling of any then-current disability or attendant accommodations.

When viewed in full, nothing was enough to act as a request for ADA accommodation.  Rood (more accurately lawyer) thoroughly outlined his position during the zoning proceedings.  Both in person and in writing, he meticulously explained why the Town should grant the Exemption.  His presentation parsed nuanced issues with cogent legal reasoning.  For instance, Rood argued the minutiae of the Town's zoning, permitting, and statutory requirements.  He even went as far as contending the Town erred by misapplying res judicata when collateral estoppel supported his position.  Yet within all that sophisticated argument, Rood never said he was disabled and wanted an ADA accommodation.  *See Schwarz*, 544 F.3d at 1219 (noting

plaintiff did not demand accommodation presuit by failing to ask for one at town meeting and arguing merits of code issue instead).

Again, Rood must show the Town had "enough information to know of both the disability and desire for an accommodation." *Hunt*, 814 F.3d at 1226. Both are missing.

As detailed, nothing in the record reasonably suggests the Town knew Rood was disabled. Various statements referred to someone needing a wheelchair. But those instances did not identify Rood. Nor did they describe his disability. Rood never used a wheelchair. So whatever his disability, vague and disparate references to a wheelchair did not put the Town on notice of Rood's then-current disability. And as the Town advocates, it did not have to accommodate Rood's possible future disabilities.

Likewise, the circumstances did not reveal Rood wanted an ADA accommodation. As shown, the Town had no reason to think Rood sought the Dune Walkover to accommodate his disability. Rather, all interested parties focused on the environmental and societal impacts of the project. And it seemed the Dune Walkover was just intended to facilitate beach access from the Property without regard to any disabilities. This was not notice of an accommodation. *See Palmer v. McDonald*, 824 F. App'x 697, 979 (11th Cir. 2020) ("An accommodation request must be sufficiently direct and specific, it must at the least explain how the accommodation requested is linked to some

disability." (cleaned up)); *see also Freadman v. Metro. Prop. And Cas. Ins.*, 484 F.3d 91, 102-03 (1st Cir. 2007).

At bottom, the ADA does not expect accommodation by ambush. Before bringing a failure-to-accommodate claim, plaintiff must request an accommodation. Despite countless chances to make one, Rood never did so. The claim, therefore, fails. *E.g., Byrd v. UPS*, 814 F. App'x 536, 540 (11th Cir. 2020); *Gatson*, 167 F.3d at 1364.[8]

Even leaving that aside, the Court concludes there is a separate reason to grant the Motion.

## C. Accommodation

If Rood requested an accommodation, the ADA did not require it. In short, the Dune Walkover was not a reasonable accommodation.

ADA plaintiffs are not entitled to their most-preferred accommodations, just those that are reasonable. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). "The reasonableness inquiry considers whether the requested accommodation is both efficacious and proportional to the costs to implement it." *Schaw*, 938 F.3d at 1265 (cleaned up). To decide whether an accommodation is reasonable, courts balance the

---

[8] *See also Adigun v. Express Scripts, Inc.*, 742 F. App'x 474, 476-77 (11th Cir. 2018); *Cazeau v. Wells Fargo Bank, N.A.*, 614 F. App'x 972, 982 (11th Cir. 2015); *Roddy v. City of Villa Rica, Ga.*, 536 F. App'x 995, 1000-01 (11th Cir. 2013); *Barneman v. Int'l Longshoreman Ass'n Local 1423*, 840 F. App'x 468, 478 (11th Cir. 2021).

relative needs. *Id.* For instance, "An accommodation isn't reasonable if it requires a fundamental alteration in the nature of a program or imposes undue financial and administrative burdens." *Id.* (cleaned up); *Schwarz*, 544 F.3d at 1220. This decision is "highly fact-specific." *Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002).

"A plaintiff carries the initial burden of showing that his proposed accommodation is reasonable." *Schaw*, 938 F.3d at 1265. If plaintiff carries the burden, it is incumbent on "defendant to demonstrate why the requested accommodation would cause undue hardship." *Id.*

The inquiry here proceeds in three independent parts.

### 1. Fundamental Alteration

First, the Town is right—the Exemption would have fundamentally altered the nature of its EC zoning scheme.

"An accommodation requires a fundamental alteration if it would eliminate an essential aspect of the relevant activity." *Id.* at 1266 (cleaned up). "Whether a particular aspect of an activity is essential will turn on the facts of each case." *Id.* In deciding this question, courts should keep "in mind the 'basic purpose' of the policy or program at issue." *Id.* at 1267.

At bottom, this is a zoning case. "The basic purpose of zoning is to bring complementary land uses together, while separating incompatible ones." *Schwarz*, 544 F.3d at 1221. So it would typically be a "fundamental alteration

of [a] zoning scheme if the proposed [accommodation] was incompatible with surrounding land uses." *Id.* If an accommodation is "quite similar to surrounding uses," however, "it will be more difficult to show" how the request might fundamentally alter the scheme. *Id.*

The Dune Walkover would bisect EC land. According to the zoning code, the purpose of labeling a zone EC "is to designate beaches and significant wetlands whose preservation is deemed critical to the Town." Fort Myers Beach Code of Ord. § 34-652(a). And this zoning scheme "is intended to prevent public harm by precluding the use of land for purposes for which it is unsuited in its natural state and which injures the rights of others or otherwise adversely affects a defined public interest." *Id.* § 34-652(b).

Arguing the Exemption was a fundamental alteration, the Town hits the nail on the head. On its face, building the Dune Walkover through an EC zone would change the complexion of the area by encroaching on land protected from development. Put another way, the Dune Walkover was "incompatible with surrounding land uses" of the "zoning scheme." *Schwarz*, 544 F.3d at 1221.

This is not conjecture. The Town never granted a single dune walkover exemption to a homeowner. Stated different, Rood would be the only person in Town with one of these structures on EC land. Nor is there evidence of the Town ever allowing an exemption for any other landowner development within

this zone. Of course, allowing a private person to develop environmental conservation land for the first time would change that protected area.[9]

True enough, the Town granted five exemptions for dune walkovers through EC land. This is a red herring though. All those structures are split between two public parks. So those exemptions are intrinsically different. Each connects a public park to a public beach in service of the entire community—including Rood. Again, the Dune Walkover differs. Even if it services Rood's whole neighborhood, the structure is still behind the Property and allows a private citizen preferential beach access.

What's more, there is no indication whether these walkovers are similar. The Dune Walkover is unique. It does not just traverse a sand dune behind the Property. Instead, it creates a walkway over two lagoons. As one Town councilmember said, "This is actually a lagoon walkover." Nothing suggests the public walkovers—or anything else in Town—provide a permanent walkway over a coastal lagoon (much less in an EC zone).

In short, allowing Rood to build the Dune Walkover would fundamentally alter the area.

---

[9] None of this considers a knock-on effect that might follow the Dune Walkover. If the Town must grant the Exemption for Rood, what's to stop neighbors from seeking similar exemptions? As Rood testified, the Town is small, and neighbors would know about approval for this project. (Doc. 53-7 at 115-16). It tracks they might follow suit. Still, there is no indication how many other Town residents border EC land. Nor does anything suggest disabilities among that group. So this is not considered.

*2. Necessity*

Next, the parties dispute whether the Exemption was a necessary accommodation.  It wasn't.

"To succeed on a failure-to-accommodate claim, a plaintiff must demonstrate that its requested accommodation is 'necessary.'" *Sailboat Bend, 479 F. Supp. 3d at 1298* (quoting 42 U.S.C. § 12182(b)(2)(A) (ADA Title III); 42 U.S.C. § 3604(f)(3)(B) (FHAA)); *see also* 28 C.F.R. § 35.130(b)(7)(i) (ADA Title II).[10]  That term carries its plain meaning of "indispensable, requisite, essential . . . or absolutely required."  *Worchheimer v. Philadelphian Owners Ass'n, 903 F.3d 100, 105-07 (3d Cir. 2018).*

So "a 'necessary' accommodation is one that alleviates the effects of a disability."  *Bhogaita, 765 F.3d at 1289.*  For necessity, the accommodation must "address the needs created by the" disability.  *Schwarz, 544 F.3d at 1226.* (emphasis omitted).  When "accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity to use and enjoy a dwelling."  *Schwarz, 544 F.3d at 1226.*  The statutory and regulatory plain language "cannot support" that result.  *Id.*

---

[10] As there is no challenge to the regulation's validity, any argument is waived.  *Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1081-82 & 1082 n.13 (11th Cir. 2007)* (explaining Title II's text does not contemplate failure-to-accommodate claims, but DOJ regulations gap fill).

The requested accommodation—if any—related to the Dune Walkover as necessary to alleviate the effect of being in a wheelchair or similar device. But again, that was not how Rood's disability manifested. He never used a wheelchair. So the requested accommodation did not "address the needs created by the" disability. *Schwarz*, 544 F.3d at 1226. While wheelchair use might be an anticipated need in the future, the Town need not accommodate an unsure disability that may never develop. *Id.* Since Rood did not need a wheelchair accommodation, there was no obligation to provide one. *D'Onofrio*, 964 F.3d at 1022 (If plaintiff "does not require an accommodation," defendant "is under no obligation to make an accommodation," no matter if the accommodation "is reasonable and could be easily provided.").

True, Rood sometimes used a cane to assist with balance. But the record does not support an accommodation request for effects of using that device. None of the Town's decisionmakers who denied the Exemption believed Rood was disabled. To the extent one could infer they knew of Rood's disability (which would be unreasonable), there was nothing before the Town alluding to Rood's cane use. Because the Town was not presented with any information of a cane-related disability, it cannot be held liable for failing to accommodate. *Schwarz*, 544 F.3d at 1219 (Defendant "cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." (citation omitted)). As much as Rood

tries to make this argument, the Town is correct such efforts are improper at summary judgment. *Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (citation omitted)).

Even if it could be read into the record—which would require a series of unreasonable inferences—nothing suggests the Dune Walkover was necessary to address Rood's disability (i.e., using a cane for balance and avoiding uneven ground or long distances without a break). This is not a matter of semantics. As *Schaw* emphasized, necessary accommodations alleviate "effects" of disabilities, not necessarily the disability itself. 938 F.3d at 1270. Regardless of the Dune Walkover, the beach has sand and uneven ground. While one may comfortably assume a wheelchair cannot move well in sand, the same inference does not automatically apply to using a cane. Yet the record lacks any explanation for how the Dune Walkover is *necessary* to help Rood walk while using a cane in the sand. Put simply, there is no evidence how the Dune Walkover improves any effects of Rood's disability as demanded by the ADA.

In short, the Town is correct Rood failed to demonstrate he requested an accommodation necessary to address his disability.

### 3. *Equality*[11]

Finally, leaving aside the other components above, the Court still finds the Dune Walkover was an unreasonable accommodation. As the Town argues, this project seeks preferential treatment, which the ADA does not require. *E.g.*, *Philippeaux v. Apartment Inv. & Mgmt.*, 598 F. App'x 640, 644 (11th Cir. 2015) ("Preferential treatment is not required."). Instead, the ADA only requires equality between disabled and nondisabled people. *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998); *Schwarz*, 544 F.3d at 1226; *see also Sailboat Bend*, 479 F. Supp. 3d at 1324 n.19 (explaining application of FHAA equality principles to ADA cases).

Equal has its ordinary definition of "having the same status, rights, or opportunities." *Schaw*, 938 F.3d at 1272 (citation omitted). As above, the focus is "on uniformity of effect rather than application." *Id.* (cleaned up). In other words, the point is to provide disabled people with substantially equal opportunities, even if it might involve accommodations giving preference. *Id.* "This doesn't mean, of course, [a disabled person] is entitled to an accommodation that would place him in a *better* position to enjoy a dwelling than a member of the general public." *Id.*

---

[11] While often treated as one-in-the-same, *Schaw* clarified necessity and equality are "separate-but-related elements." 938 F.3d at 1269.

The Dune Walkover would place Rood in a far better position than nondisabled people.  Again, no private person has a walkover in the EC zone.  So Rood seeks favored land use, not an equal opportunity to access the beach.

Underlying this conclusion (once more) is the nature of the project.  Just about every parcel of land is unique.  *Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 788 (11th Cir. 1984).  The Property is no different.  Recall, the Dune Walkover would traverse two coastal lagoons.  Given these lagoons, the Property—regardless of owner—offers the same limited beach access as some neighbors and less than others.  As with all real estate, location matters.  For instance, some of Rood's neighbors apparently suffer from the same access issue.  So the argument seems to be Rood should receive privileged beach access over his neighbors because of his disability.  This is precisely the type of preferential treatment the ADA does not require.  *Schaw*, 938 F.3d at 1272 (An accommodation must "ensure the disabled receive the same housing opportunities as everybody else, it does not require *more or better* opportunities." (citation omitted)).

To mitigate any effect of Rood lacking a beach route, the Town provides public access at various points.  As discussed, there are at least two public parks with dune walkovers.  Rood makes no argument on why he cannot use those.  What's more, the Town secured landowner permission for Rood to use a beach access point a quarter mile from his house.  (Doc. 53-7 at 107-08).

Because it has no parking and Rood cannot walk that far, he claims the place is unavailable.  Even if so, it is undisputed Rood can access the beach from another public spot (with a parking lot) two miles away.  Without a shred of evidence, Rood says this is inconvenient because parking is limited.  But whether this access is most preferred by Rood is beside the point.  *See Stewart, 117 F.3d at 1286* (An "individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." (cleaned up)).

At bottom, Rood seeks privileged treatment because he prefers that over the other beach access options open to him and the public.

For all those reasons, the Court grants the Motion.

Accordingly, it is now **ORDERED:**

1. Defendant's Motion for Final Summary Judgment (Doc. 53) is **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment, deny any pending motions, terminate all deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on August 18, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record

26